WISE, Judge.[1]
The appellant, Mark Anthony Duke, was convicted of murder made capital in connection with the deaths of Randy Gerald Duke, Dedra Mims Hunt, Chelisa Nicole *10 Hunt, and Chelsea Marie Hunt. The murders were made capital because they were committed “by one act or pursuant to one scheme or course of conduct.” See § 13A-5-40(a)(10), Ala.Code 1975. After a sentencing hearing, the jury recommended, by a vote of 10-2, that Duke be sentenced to death. The trial court accepted the jury’s recommendation and sentenced Duke to death by electrocution.
Duke does not challenge the sufficiency of the State’s evidence presented in support of his conviction. However, because this is a case involving imposition of the death penalty, we have reviewed the evidence, and we find that it is sufficient to support Duke’s conviction for capital murder. The following summary of the crime and Duke’s participation in it is taken from the trial court’s written findings of fact, which comprises a part of its sentencing order:[2]
“On March 23, 1997, about 9:00 P.M., an operator at [emergency number] 911 was called by the Defendant, Mark Anthony Duke, then a 16-year-old male (hereinafter referred to as ‘Defendant’). The Defendant told the 911 operator that his father had been killed and said that ‘they’ had killed him.
“The Pelham police arrived at Mr. Duke’s house and discovered the bodies of four deceased persons: Defendant’s father, Randy Duke, age 39 years (hereinafter referred to as ‘Mr. Duke’); De-dra Hunt, age 29 years; Chelisa Hunt, age 6 years; and Chelsea Hunt, age 7 years. ... Mark Hall of the Pelham Police Department found .32 caliber and .45 caliber spent shells.
“The Defendant was asked questions by the police to ascertain possible suspects. The Defendant told the police when he arrived at Mr. Duke’s house, he went no further than the foyer where he saw his father, Mr. Duke’s body. The Defendant was also asked if he wished to be placed in protective custody, which he responded in the affirmative.
“Sometime later, during the course of investigation by the City of Pelham Police Department, the police discovered Defendant had spoken to one Sarah Woodruff and had told her that he had killed his family.
“The investigation led to two other co-defendants, Mike Ellison (hereinafter referred to as ‘Ellison’) and David Collums (hereinafter referred to as ‘Collums’) and to a fourth and final Defendant, Brandon Samra (hereinafter referred to as ‘Samra’). Statements from Sarah Woodruff and the other Defendant(s) led to the recovery of the weapons and to the Defendant in this case being a suspect with his eventual arrest.
“Evidence further revealed:
“On that Saturday night of March, 1997, the Defendant, who had been with the co-defendants, went to his father’s house and there he asked his father, Mr. Duke, if he could use his truck. Mr. Duke denied Defendant use of the truck. The Defendant, with the co-defendants, then went over to Michael Ellison’s house and while there, the Defendant said he was tired of his father bossing him around and he was going to kill his father. He gained access to a .45 caliber pistol and Ellison gained access to a .32 caliber pistol. The Defendant wiped the .45 caliber pistol down and took each bullet out and wiped them down and replaced them in the magazine. Michael *11 Ellison got the .32 caliber pistol and wiped it down. The Defendant and the co-defendants then went back to Mr. Duke’s house in a vehicle Michael Ellison was driving. Ellison handed the .32 caliber pistol to Samra. Samra and the Defendant got out of the vehicle and went into Mr. Duke’s house. Ellison and Collums stayed out in the vehicle. Sometime prior to going into the house, either Ellison or Collums inquired about the two children and Ms. Hunt. In reply, the Defendant said they could not leave any witnesses.
“Inside the house beyond the foyer area, was Mr. Duke, Dedra Hunt (hereinafter referred to as ‘Ms. Hunt’), and Ms. Hunt’s two small children, Chelisa and Chelsea. The house had a main level, an upstairs, and a basement. They were all on the main level when the Defendant and Samra walked in. The Defendant and Samra had agreed on who was to kill Mr. Duke and Ms. Hunt.'
“With the .45 caliber pistol, the Defendant shot Mr. Duke once. The Defendant then attempted to shoot Mr. Duke a second time which missed, possibly because Mr. Duke threw an artificial cat at the Defendant while he was aiming for Mr. Duke. The Defendant fired a third shot at Mr. Duke and prior to this third shot, the Defendant stated that he (Defendant) would see him (Mr. Duke) in hell.
“While the Defendant was shooting Mr. Duke, Samra fired the .32 caliber pistol at Ms. Hunt and the shot hit Ms. Hunt and knocked some teeth out. Ms. Hunt and the two children ran upstairs and while she was running, Samra fired a second shot at her which connected. Ms. Hunt went into the upstairs bathroom with her daughter, Chelisa and locked the bathroom door.
“The Defendant went upstairs after Ms. Hunt and the two children. The bathroom door was locked and Samra attempted to kick the bathroom door .in, but to no avail. The Defendant then knocked a hole in the door and reached inside and unlocked the door. The Defendant then shot Ms.-Hunt. The Defendant also had a knife at that time and went to the shower where Chelisa was. The Defendant cut Chelisa’s throat, telling her that it would only hurt a minute.
“Thereafter, the Defendant went into the bedroom where Chelsea was under the bed. The Defendant pulled Chelsea out from underneath the bed. Chelsea apparently attempted to fend off' the Defendant as she sustained about 15 knife wounds on her left hand and three knife wounds on her right hand. Due to Chelsea’s struggle with the Defendant, the Defendant told Samra to help him. Then both the Defendant and Samra killed Chelsea by cutting her throat.-
“Before the Defendant and Samra left Mr. Duke’s house, the Defendant went to where his father was and took Mr. Duke’s wallet. They also took the knives used in the killings and threw those in a storm drain nearby. In addition, Samra and the Defendant washed their hands and hid the guns. Thereafter, the four Defendants went to a movie and kept the movie stubs to'have an alibi.
“The following day, they went back to Mr. Duke’s home and made it look like a burglary and a killing as a result thereof by rummaging through the house.
“Ms. Phyllis Rolan, a D.N.A. expert, testified at the trial. Blood had been found in Mr. Duke’s kitchen and based on Ms. Rolan’s testimony, the Court concluded the blood in the kitchen was Mr. Duke’s that Defendant got on him. The Court concluded the Defendant went *12 into the kitchen to obtain knives to assist in the killings of Ms. Hunt and the two children. Mr. Duke’s blood was also found in the hole of the upstairs bathroom door, which indicated it came from the Defendant as he reached in to unlock the bathroom door. Blood of Mr. Duke was also found on a bandanna that Defendant owned which was found beside Chelsea. Mr. Duke’s blood was also on the Defendant’s right tennis shoe and Ms. Hunt’s blood on the Defendant’s left tennis shoe. Mr. Duke’s blood was also found on Defendant’s cap.
“Samra testified as to the Defendant’s involvement in the deaths of the above four individuals. Sarah Woodruff also testified to Defendant’s admission to her of the killings.
“Dr. Joseph Embry, a physician employed by the Alabama Department of Forensic [Sciences], who has previously performed over 4,000 autopsies in his career, ... conducted separate autopsies of the four deceased persons in this case. His opinion was consistent with the above testimony that gunshot wounds and stab wounds killed the four persons. Dr. Embry concluded that Chelisa’s throat was cut and there was bleeding in Chelisa’s airways and that Chelisa could have only lived for a matter of minutes after her throat was cut. Dr. Embry also concluded that the cuts of Chelsea’s neck caused Chelsea’s death. He pointed out that Chelsea had a number of defensive cuts as well. Dr. Embry also supplied bullets he found during his autopsies to Ed Moran of the Department of Forensic [Sciences].
“With the assistance of Ellison, the .32 caliber pistol and the .45 caliber pistol were recovered.
“Mr. Ed Moran, a ballistics expert with the Alabama Department of Forensic [Sciences], who received spent shells and bullets recovered from the bodies of Mr. Duke and Ms. Hunt, compared those spent shells and the bullets to the .32 caliber pistol and the .45 caliber pistol recovered. In his opinion they were consistent with each other.”
(C. 548-52.)
Both Duke and Samra were indicted on charges of capital murder because the multiple murders were committed pursuant to a common scheme or plan. Samra was tried first; he was convicted of capital murder and was sentenced to death.[3]

Standard of Review

In every case where the death penalty is imposed, this Court must review the record for any plain error, i.e., for any defect in the proceedings, whether or not the defect was brought to the attention of the trial court. Rule 45A, Ala.R.App.P., provides:
“In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
As this Court stated in Hall v. State, 820 So.2d 113, 121 (Ala.Crim.App.1999), aff’d, Ex parte Hall, 820 So.2d 152 (Ala.2001):
“The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in re *13 viewing an issue that was properly-raised in the trial court or on appeal. As the United States Supreme Court stated in United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the plain-error doctrine applies only if the error is ‘particularly egregious’ and if it ‘seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.’ See Ex parte Price, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999); Burgess v. State, 723 So.2d 742 (Ala.Cr.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999); Johnson v. State, 620 So.2d 679, 701 (Ala.Cr.App.1992), rev’d on other grounds, 620 So.2d 709 (Ala.1993), on remand, 620 So.2d 714 (Ala.Cr.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993).”
Although Duke’s failure to object at trial will not preclude this Court from reviewing an issue in this case, it will, nevertheless, weigh against any claim of prejudice he makes on appeal. See Dill v. State, 600 So.2d 343 (Ala.Crim.App.1991), aff'd, 600 So.2d 372 (Ala.1992), cert, denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993).
A number of the issues Duke raises on appeal were not first brought to the trial court’s attention. Accordingly, this Court’s review of those matters is limited to the application of the plain-error doctrine.

Guiltr-Phase Issues

I.
Duke argues that Alabama’s statute limiting the fees of court-appointed attorney to $1,000 for out-of-court work in each phase of a capital case, § 15-12-21, Ala.Code 1975, violates the separation-of-powers doctrine, deprives indigent defendants of effective assistance of counsel, constitutes a taking of private property without just compensation, and violates the Equal Protection Clause of the United States Constitution.
Alabama’s statutory limitation on compensation has withstood numerous challenges on these same grounds. See, e.g., Ex parte Smith, 698 So.2d 219 (Ala.), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997); May v. State, 672 So.2d 1310 (Ala.1995); Ex parte Grayson, 479 So.2d 76 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985); Sparks v. Parker, 368 So.2d 528 (Ala.), appeal dismissed, 444 U.S. 803, 100 S.Ct. 22, 62 L.Ed.2d 16 (1979); Dorsey v. State, 881 So.2d 460 (Ala.Crim.App.2001); Samra v. State, 771 So.2d 1108 (Ala.Crim.App.1999), aff'd, 771 So.2d 1122(Ala.), cert. denied, 531 U.S. 933, 121 S.Ct. 317, 148 L.Ed.2d 255 (2000); Stewart v. State, 730 So.2d 1203 (Ala.Crim.App.1997), aff'd, 715 So.2d 852 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998); Slaton v. State, 680 So.2d 879 (Ala.Crim.App.1995), aff'd, 680 So.2d 909 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997). As we noted in Samra v. State, 771 So.2d at 1112: “Because this court is bound by the decisions of the Alabama Supreme Court, we are not in a position to reverse that court’s approval of the current compensation system.” Accordingly, no basis for reversal exists as to this claim.
We further note that the Alabama Legislature has amended § 15-12-21, Ala. Code 1975, to increase the attorney fees for all court-appointed attorneys. As of June 10, 1999, there is no maximum on the amount an attorney appointed to represent an indigent defendant in a capital case may be paid.
II.
Duke next argues that the circuit court erred to reversal when it denied his *14 motion for a change of venue made based on, he claims, prejudicial pretrial publicity.
“ ‘A trial court is in a better position than an appellate court to determine what effect, if any, pretrial publicity might have in a particular case. The trial court has the best opportunity to evaluate the effects of any pretrial publicity on the community as a whole and on the individual members of the jury venire. The trial court’s ruling on a motion for a change of venue will be reversed only when there is a showing that the trial court has abused its discretion. Nelson v. State, 440 So.2d 1130 (Ala.Cr.App.1983).’
“Joiner v. State, 651 So.2d 1155, 1156 (Ala.Cr.App.1994).”
Clemons v. State, 720 So.2d 961, 977 (Ala.Crim.App.1996), aff'd, 720 So.2d 985 (Ala.1998), cert. denied, 525 U.S. 1124, 119 S.Ct. 907, 142 L.Ed.2d 906 (1999). Indeed, this Court rejected a similar claim in reviewing the appeal of Duke’s codefendant. We noted:
“ ‘The mere fact that publicity and media attention were widespread is not sufficient to warrant a change of venue. Rather, Ex parte Grayson[, 479 So.2d 76 (Ala.1985),] held that the appellant must show that he suffered actual prejudice or that the community was saturated with prejudicial publicity.’ Slagle v. State, 606 So.2d 193, 195 (Ala.Cr.App.1992). ‘ “Moreover, the passage of time cannot be ignored as a factor in bringing objectivity to trial.” ’ Whisenhant v. State, 555 So.2d 219, 224 (Ala.Cr.App.1988), aff'd, 555 So.2d 235 (Ala.1989), cert. denied, 496 U.S. 943, 110 S.Ct. 3230, 110 L.Ed.2d 676 (1990) (citations omitted) (quoting Dannelly v. State, 47 Ala.App. 363, 254 So.2d 434, cert. denied, 287 Ala. 729, 254 So.2d 443 (1971)).
“ ‘In connection with pretrial publicity, there are two situations which mandate a change of venue: 1) when the accused has demonstrated “actual prejudice” against him on the part of the jurors; 2) when there is “presumed prejudice” resulting from community saturation with such prejudicial pretrial publicity that no impartial jury can be selected. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Rideau [v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) ]; Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Ex parte Gray-son, 479 So.2d 76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985); Coleman v. Zant, 708 F.2d 541 (11th Cir.1983).’
“Hunt v. State, 642 So.2d 999, 1042-43 (Ala.Cr.App.1993), aff'd, 642 So.2d 1060 (Ala.1994).”
Samra v. State, 771 So.2d at 1113.
Duke does not argue that the jurors were actually prejudiced against him. Therefore, we will address only whether the pretrial publicity resulted in “presumptive prejudice.” As we stated in Samra:
“For prejudice to be presumed under this standard, the defendant must show: 1) that the pretrial publicity was prejudicial and inflammatory and 2) that the prejudicial pretrial publicity saturated the community where the trial was held. Coleman v. Kemp, 778 F.2d 1487 (11th Cir.1985), cert. denied, 476 U.S. 1164, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986). Under this standard, a defendant carries an extremely heavy burden of proof.”
771 So.2d at 1114. This Court addressed at length the burden a defendant must meet to establish “presumptive prejudice” *15 in Hunt v. State, 642 So.2d 999 (Ala.Crim.App.1993), aff'd, 642 So.2d 1060 (Ala.1994):
“Hunt relies on the ‘presumed prejudice’ standard announced in Rideau [v. Louisiana, 373 U.S. 723 (1963) ], and applied by the United States Supreme Court in Estes [v. Texas, 381 U.S. 532 (1965)] and Sheppard [v. Maxwell, 384 U.S. 333 (1966) ]. This standard was defined by the Eleventh Federal Circuit Court of Appeals in Coleman v. Kemp, 778 F.2d 1487 (11th Cir.1985), cert. denied, 476 U.S. 1164, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986). The court stated: ‘Prejudice is presumed from pretrial publicity when pretrial publicity is sufficiently prejudicial and inflammatory and the prejudicial pretrial publicity saturated the community where the trials were held.’ 778 F.2d at 1490 (emphasis added [in Hunt]). See also Holladay v. State, 549 So.2d 122, 125 (Ala.Cr.App.1988), affirmed, 549 So.2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989).
“In determining whether the ‘presumed prejudice’ standard exists the trial court should look at ‘the totality of the surrounding facts.’ Patton v. Yount, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984); Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). The presumptive prejudice standard is ‘rarely’ applicable, and is reserved for only ‘extreme situations.’ Coleman v. Kemp, 778 F.2d at 1537. ‘In fact, our research has uncovered only a very few ... cases in which relief was granted on the basis of presumed prejudice.’ Coleman v. Kemp, 778 F.2d at 1490.
“Hunt had the burden of showing that ‘prejudicial pretrial publicity’ saturated the community. Sheppard, supra. ‘[T]he burden placed upon the petitioner to show that pretrial publicity deprived him of his right to a fair trial before an impartial jury is an extremely heavy one.’ Coleman v. Kemp, 778 F.2d at 1537. ‘Prejudicial’ publicity usually must consist of much more than stating the charge, and of reportage of the pretrial and trial processes. ‘Publicity’ and ‘prejudice’ are not the same thing. Excess publicity does not automatically or necessarily mean that the publicity was prejudicial.
[[Image here]]
“... In order to meet the burden of showing the necessity for a change of venue due to pretrial publicity on the grounds of community saturation, ‘the appellant must show more than the fact “that a case generates even widespread publicity.” ’ Oryang v. State, 642 So.2d 979, 983 (Ala.Cr.App.1993), quoting, Thompson v. State, 581 So.2d 1216, 1233 (Ala.Cr.App.1991), cert. denied, 502 U.S. 1030, 112 S.Ct. 868, 116 L.Ed.2d 774 (1992).
“ ‘ “Newspaper articles alone would not necessitate a change in venue unless it was shown that the articles so affected the general citizenry through the insertion of such sensational, accu-sational or denunciatory statements, that a fair and impartial trial was impossible. Patton v. State, 246 Ala. 639, 21 So.2d 844 [1945].” ’
“Thompson, 581 So.2d at 1233, quoting McLaren v. State, 353 So.2d 24, 31 (Ala.Cr.App.), cert. denied, 353 So.2d 35 (Ala.1977).
“A review of the media coverage contained in the record on appeal demonstrates that the majority of print media coverage was reasonably factual and more or less objective. We find that the reportage by the news media did not *16 result in the community being so ‘pervasively saturated’ with prejudicial publicity so as to make the court proceedings nothing more than a ‘hollow formality.’ Rideau, supra.”
Hunt v. State, 642 So.2d at 1043-44. Given that this Court upheld the circuit court’s denial of a change-of-venue motion in Hunt — a case involving criminal charges against a sitting governor' — reserves the “presumptive prejudice” standard for only the most notorious cases. As we stated in Samra: “ ‘To justify a presumption of prejudice under this standard, the publicity must be both extensive and sensational in nature. If the media coverage is factual as opposed to inflammatory or sensational, this undermines any claim for a presumption of prejudice.’ ” 771 So.2d at 1115 (quoting United States v. Angiulo, 897 F.2d 1169, 1181 (1st Cir.), cert. denied, 498 U.S. 845, 111 S.Ct. 130 (1990)).
In support of his change-of-venue motion, Duke introduced testimony concerning a poll of Shelby County residents concerning the case. The results showed that 80.7% of the respondents had heard about the case.[4] Of those who had heard about the case, 49% were of the opinion that Duke was guilty. Moreover, our review of the newspaper and media coverage reveals that it was factual, rather than inflammatory.
“The standard of fairness does not require jurors to be totally ignorant of the facts and issues involved. Murphy v. Florida, 421 U.S. 794, 799-800, 95 S.Ct. 2031, 2035-2036, 44 L.Ed.2d 589 (1975). Thus, ‘[t]he proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination.’ Anderson v. State, 362 So.2d 1296, 1299 (Ala.Crim.App.1978).”
Ex parte Grayson, 479 So.2d at 80. See also Stallworth v. State, 868 So.2d 1128, 1142 (Ala.Crim.App.2001). In the present case, the potential jurors were questioned extensively regarding any knowledge they might have regarding this ease. Jurors first filled out a lengthy juror questionnaire; they were subsequently subjected to extensive voir dire examination by both the circuit judge and all counsel involved. Any jurors who expressed familiarity with the facts of the case were further questioned regarding whether they would be able to set aside anything they had learned about the case and render a verdict based solely on the evidence presented at trial. Any juror who indicated that he or she could not meet this requirement was excused from the venire.
For these reasons, Duke has failed to show that the jurors were presumptively prejudiced against him. Accordingly, the circuit court did not abuse its discretion in denying his motion for a change of venue.
III.
Duke also argues that the trial court erred when it denied his application for youthful-offender status. Because this issue was not raised at trial, we review this claim under the plain-error doctrine.
On June 13, 1997, the circuit court reviewed Duke’s application for youthful-offender status. Before June 13, the circuit court had ordered and received an investigative report from the Alabama Board of Pardons and Paroles. After reviewing the report, the court denied Duke’s motion for youthful-offender treatment. Following denial of the motion, *17 Duke was arraigned on capital-murder charges.
“In determining whether to treat a defendant as a youthful offender, the trial court has nearly absolute discretion. Morgan v. State, 363 So.2d 1013 (Ala.Crim.App.1978); see, also, Ex parte Farrell, 591 So.2d 444, 449-50, n. 3 (Ala.1991). There is no set method for considering a motion requesting such treatment. Edwards v. State, 294 Ala. 358, 317 So.2d 512 (1975). However, the Youthful Offender Act, § 15-19-1, Ala. Code 1975, requires that the court conduct a factual investigation into the defendant’s background. Ware v. State, 432 So.2d 555 (Ala.Crim.App.1983). Generally, the trial court considers the nature of the crime charged, any prior convictions, the defendant’s age, and any other matters deemed relevant by the court. Clemmons v. State, 294 Ala. 746, 321 So.2d 238 (1975). Moreover, the trial court need not articulate on the record its reasons for denying the defendant youthful offender status. Garrett v. State, 440 So.2d 1151, 1152-53 (Ala.Crim.App.1983), cert. denied (Ala.1983). Accord, Goolsby v. State, 492 So.2d 635 (Ala.Crim.App.1986).”
Reese v. State, 677 So.2d 1239, 1240 (Ala.Crim.App.1995).
We find no merit to Duke’s argument that the denial of his request for treatment as a youthful offender was error because, he says, that denial was allegedly based solely on the nature of the crime-charged. Contrary to Duke’s claim, we find no indication that the circuit court’s denial of youthful-offender status was based “ ‘solely and only upon a consideration of the nature of the crime charged.’ ” Grier v. State, 589 So.2d 792, 794 (Ala.Crim.App.1991) (quoting Watkins v. State, 357 So.2d 156, 160 (Ala.Crim.App.1977)). Accordingly, no basis for reversal exists as to this contention.
IV.
Duke contends that the security measures used during his trial were excessive and that the use of those measures prejudiced him before the jury, thus violating his right to a fair trial. The record reveals that when Duke objected to the security, the circuit court commented that the security was hardly noticeable. Nevertheless, the court took additional steps to ensure that the security officers remained out of sight during individual voir dire examination.
“ ‘ “Every court has power to preserve and enforce order in its immediate presence; to prevent interruption, disturbance, or hindrance to its proceedings; and to control all persons connected with a judicial proceeding before it.” ’ ” Wood v. State, 699 So.2d 965, 966 (Ala.Crim.App.1997). This Court has noted, on numerous occasions, that
“The trial court can best determine what security measures are necessary. “Within constitutional limits, great weight must be accorded the discretion of the trial court. The trial judge is responsible for maintaining order in his courtroom. He understands infinitely better than we what is necessary to perform his duty.’ Goodwin v. State, 495 So.2d 731, 733 (Ala.Crim.App.1986).”
Windsor v. State, 683 So.2d 1027, 1033 (Ala.Crim.App.1994), aff'd, 683 So.2d 1042 (Ala.1996). See also Ponder v. State, 688 So.2d 280, 291 (Ala.Crim.App.1996).
Duke has failed to show that the circuit court abused its discretion with regard to the security measures taken during his trial. Accordingly, no basis for reversal exists as to this claim.
*18 V.
Duke next contends that the State’s use of a doll to demonstrate how the children Chelsea and Chelisa Hunt were killed constituted reversible error. Specifically, he argues that the “use of a mannequin which was not comparable to the size and physical characteristics of the victim constitutes prejudice that is not outweighed by any probative value,” citing United States v. Gaskell, 985 F.2d 1056 (11th Cir.1993), as authority for this contention.
A claim of this nature is relatively rare; however, this Court in Minor v. State, 780 So.2d 707 (Ala.Crim.App.1999), rev’d on other grounds, 780 So.2d 796 (Ala.2000), addressed the use of a doll in a capital-murder prosecution to demonstrate how the victim’s injuries may have occurred. We stated:
“ ‘The rule on the admissibility of experiments in open court is stated in Shows v. Brunson, 229 Ala. 682, 682, 159 So. 248 (1935).
“ ‘ “Experiments or tests of this character in open court are usually within the discretion of the trial judge, guided by a sound judgment as to whether the result will be sufficiently relevant and material to warrant such procedure. 22 C.J. p. 700, § 899.
“ ‘ “Similarity of conditions, and a test that will go to the substantial question in hand, should appear.”
“ ‘See also Hawkins v. State, 53 Ala.App. 89, 93, 297 So.2d 813 (1974). Both the scope and extent of the experiment, if allowed, rest within the sound discretion of the trial judge. The exercise of that discretion will not be reversed on appeal unless it has been clearly and grossly abused. Campbell v. State, 55 Ala. 80 (1876); C. Gamble, McElroy’s Alabama Evidence, § 81.02(1) (3rd ed.1977).
“ ‘While the conditions of the experiment and of the occurrence in issue should be substantially similar, they need not be identical. McElroy, 81.01(4).
“ ‘ “A reasonable or substantial similarity suffices and only where the conditions are dissimilar in an essential particular should the evidence of an experiment be rejected. If we have a case where the conditions are not identical, then the dissimilarity goes to the weight of the evidence of the experiment but not to its admissibility.”
“ ‘See also Eddy v. State, 352 So.2d 1161 (Ala.Cr.App.1977).’
“Ivey v. State, 369 So.2d 1276, 1278-79 (Ala.Cr.App.1979). See also, C. Gamble, McElroy’s Alabama Evidence, § 81.02 (5th ed.1996).
“However, before the demonstration, the trial court should determine if the prejudicial effect of the demonstration substantially outweighs its probative value. Even if the trial court finds the demonstration to be relevant and helpful to the jury, the trial court may still exclude it if the probative value is substantially outweighed by the danger of unfair prejudice. See Rule 403, Ala. R.Evid.; McElroy § 81.02. ‘The power to make this determination is vested in the trial court.’ Hayes v. State, 717 So.2d [30,] 37 [(Ala.Crim.App.1997)].”
780 So.2d at 762-63.
Before the State elicited testimony from Samra demonstrating how he and Duke slit the children’s throats, the trial court conducted a hearing outside the presence of the jury to determine whether the prejudicial effect of the demonstration substantially outweighed its probative value. After hearing arguments from both sides, the circuit court permitted the use of the mannequin during Samra’s testimony. *19 The evidence established that the mannequin used by the State was slightly larger than the younger of .the two child victims and slightly smaller than the older one. Thus, Duke’s argument that the mannequin was not sufficiently similar to the victims for its use to be permissible is without merit. Clearly, whatever variations existed between the mannequin and the victims was slight. Therefore, the variations went to the weight of the evidence, not its admissibility. 780 So.2d at 763.
We note that in Minor, this Court declined to adopt the standard set out in United States v. Gaskell, the decision upon which Duke primarily bases his argument that use of the mannequin constituted reversible error. We again decline to adopt this standard. Moreover, as the State correctly points out, Gaskell is factually distinguishable from this case, in that in Gaskell the witness used greater force than was necessary to demonstrate shaken-baby syndrome. By contrast, Samra testified that his demonstration showed exactly how he and Duke killed the two child victims.
Based on the foregoing, we conclude that the trial court did not abuse its discretion in determining that the prejudicial impact of this testimony did not outweigh the probative value of Samra’s testimony and demonstration. Thus, -no basis for reversal exists as to this claim.
VI.
Duke also argues that the State unconstitutionally used its peremptory challenges to remove women and African-Americans from the jury venire. On appeal, Duke specifically contends that the State’s use of 22 of its 35 peremptory challenges to remove women and African-Americans from the venire established a prima facie showing of racial and gender discrimination, in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994).
Because Duke did not object on this ground at trial, this claim will be reviewed under the plain-error standard. See Rule 45A, Ala.R.App.P.
In Richer v. State, 663 So.2d 985, 991 (Ala.Crim.App.1994), aff'd, 663 So.2d 999 (Ala.), cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995), this Court stated:
“ ‘For plain error to exist in the Bat-son context, the record must raise an inference that the state [or the defendant] engaged in “purposeful discrimination” in the exercise of its peremptory challenges. See Ex parte Watkins, 509 So.2d 1074 (Ala.), cert. denied, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987).’
“Guthrie v. State, 616 So.2d 913, 913 (Ala.Crim.App.1992).”
See also Wilson v. State, 777 So.2d 856, 888 (Ala.Crim.App.1999), aff'd, 777 So.2d 935 (Ala.2000), cert. denied, 531 U.S. 1097, 121 S.Ct. 826, 148 L.Ed.2d 709 (2001); Smith v. State, 756 So.2d 892 (Ala.Crim.App.1998), aff'd, 756 So.2d 957 (Ala.2000).
A trial court’s ruling on a Bat-son objection is entitled to great deference; this Court will not reverse the trial court’s ruling unless it is clearly erroneous. See Ex parte Branch, 526 So.2d 609 (Ala.1987).
“A defendant making a Batson challenge bears the burden of proving a prima facie case of purposeful or intentional discrimination and, in the absence of such proof, the prosecution is not required to state its reasons for its peremptory challenges. Ex parte Branch, 526 So.2d 609 (Ala.1987). Only when the defendant establishes facts and cir *20 cumstances that raise an inference of discrimination must the State give its reasons for its peremptory strikes. Stokes v. State, 648 So.2d 1179, 1180 (Ala.Crim.App.1994).”
Ex parte Pressley, 770 So.2d 143, 145 (Ala.), cert. denied, 531 U.S. 931, 121 S.Ct. 313, 148 L.Ed.2d 251 (2000). In Pressley, the Alabama Supreme Court further noted that the mere fact that the State used a high percentage of its peremptory challenges to remove four of six African-Americans from the venire and used some of its peremptory strikes to remove females from the venire was insufficient, by itself, to establish a prima facie showing of racial or gender discrimination in the State’s use of its peremptory strikes, so as to require the State to offer explanations for the strikes. 770 So.2d at 146-47; accord Ex parte Trawick, 698 So.2d 162, 168 (Ala.), cert. denied 522 U.S. 1000, 118 S.Ct. 568, 139 L.Ed.2d 408 (1997).
Our review of the record reveals an extensive voir dire of the entire venire by both the prosecution and the defense. There is no inference raised that the State engaged in purposeful racial or gender discrimination in its use of peremptory challenges. Therefore, we find no plain error.
VIL
Duke argues that he was convicted and sentenced by an overwhelmingly death-prone jury, in violation of Morgan v. Illinois, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), and the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Specifically, he argues that “[t]he petit jury that convicted and sentenced Mark Duke was excessively death-prone. Each of the jurors who ultimately convicted Mark Duke and sentenced him to death had indicated their strong support of the death penalty.” Thus, he contends, the jurors’ views regarding the death penalty “would have substantially impaired their ability to perform their duties in accordance with their instructions and their oath.”
The Supreme Court discussed the application of Morgan v. Illinois, supra, and Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), in Ex parte Smith, 698 So.2d 219 (Ala.1997):
“Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), allows the prosecution in a capital case to strike for cause those potential jurors who would automatically vote against imposing capital punishment without regard to any evidence that might be developed at trial or those potential jurors whose attitude toward the death penalty would prevent them from making an impartial decision as to the defendant’s guilt. In Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Supreme Court held that in a capital case the prosecutor may exclude venirepersons whose views would ‘prevent or substantially impair’ their performance of their duty as ... jurors.
“In Morgan v. Illinois, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), the Supreme Court held that it violated the requirements of due process to allow the prosecution to strike for cause persons who are opposed to the death penalty while not allowing the defense to exclude for cause those venirepersons who are predisposed to impose capital punishment regardless of the evidence presented. Thus, a capital defendant may challenge for cause any venireper-son who would automatically vote to impose death if the defendant was convicted of a capital crime.”
698 So.2d at 221. In Morgan v. Illinois, the Supreme Court held that the trial court erred when it refused to ask poten *21 tial jurors whether they would be predisposed to automatically impose the death penalty, to the exclusion of any other punishment, i.e., a “reverse-Witherspoon ” question.
The voir dire examination in this case makes up a substantial portion of the record on appeal. We have reviewed the extensive voir dire examination for any evidence indicating that death-prone veni-repersons served on Duke’s petit jury. Kather than asking the Witherspoon question to determine if any potential jurors were unalterably opposed to the death penalty, the circuit court instead posed revers e-Witherspoon questions to determine whether any of the potential jurors were overwhelmingly inclined to impose the death penalty upon conviction. Each juror who served on Duke’s petit jury affirmatively indicated that he or she could set aside whatever feelings the juror had concerning capital punishment and render a verdict solely on the law and the evidence presented at trial. Accordingly, no basis for reversal exists as to this claim.
VIII.
Duke argues that the trial court erred in its rulings on a number of challenges for cause; some of those challenges for cause were made by the defense and others by the prosecution.
When reviewing a challenge for cause, we look to the following general principles of law:
“To justify a challenge for cause, there must be a proper statutory ground or ‘ “some matter which imports absolute bias or favor, and leaves nothing to the discretion of the trial court.” ’ Clark v. State, 621 So.2d 309, 321 (Ala.Cr.App.1992) (quoting Nettles v. State, 435 So.2d 146, 149 (Ala.Cr.App.1983)). This Court has held that ‘once a juror indicates initially that he or she is biased or prejudiced or has deep-seated impressions’ about a case, the juror should be removed for cause. Knop v. McCain, 561 So.2d 229, 234 (Ala.1989). The test to be applied in determining whether a juror should be removed for cause is whether the juror can eliminate the influence of his previous feelings and render a verdict according to the evidence and the law. Ex parte Taylor, 666 So.2d 73, 82 (Ala.1995). A juror ‘need not be excused merely because [the juror] knows something of the case to be tried or because [the juror] has formed some opinions regarding it.’ Kinder v. State, 515 So.2d 55, 61 (Ala.Cr.App.1986). Even in cases where a potential juror has expressed some preconceived opinion as to the guilt of the accused, the juror is sufficiently impartial if he or she can set aside that opinion and render a verdict based upon the evidence in the case. Kinder, at 60-61. In order to justify disqualification, a juror ‘ “must have more than a bias, or fixed opinion, as to the guilt or innocence of the accused” ’; ‘ “[s]uch opinion must be so fixed ... that it would bias the verdict a juror would be required to render.” ’ Oryang v. State, 642 So.2d 979, 987 (Ala.Cr.App.1993) (quoting Siebert v. State, 562 So.2d 586, 595 (Ala.Cr.App.1989)).”
Ex parte Davis, 718 So.2d 1166, 1171-72 (Ala.1998), cert. denied, 525 U.S. 1179, 119 S.Ct. 1117, 143 L.Ed.2d 112 (1999). See also McNabb v. State, 887 So.2d 929, 961-62 (Ala.Crim.App.2001); Whitehead v. State, 777 So.2d 781, 808 (Ala.Crim.App.1999), aff'd, 777 So.2d 854 (Ala.2000), cert. denied, 532 U.S. 907, 121 S.Ct. 1233, 149 L.Ed.2d 142 (2001).
This issue was also discussed at length in Dallas v. State, 711 So.2d 1101, 1107 (Ala.Crim.App.1997), aff'd, 711 So.2d 1114 (Ala.), cert. denied, 525 U.S. 860, 119 S.Ct. 145, 142 L.Ed.2d 118 (1998) *22 (quoting Taylor v. State, 666 So.2d 36, 47 (Ala.Crim.App.1994), affd, 666 So.2d 73 (Ala.1995), cert, denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996)). In Dallas, we stated:
“ ‘ “The proper standard for determining whether a prospective juror may be excluded for cause because of his or her views on capital punishment is ‘whether the juror’s views would “prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.” ’ Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985); Gray v. Mississippi 481 U.S. 648 [at 657-58], 107 S.Ct. 2045, 2051, 95 L.Ed.2d 622 (1987). ‘The crucial inquiry is whether the venireman could follow the court’s instructions and obey his oath, notwithstanding his views on capital punishment.’ Dutton v. Brown, 812 F.2d 593, 595 (10th Cir.), cert. denied, Dutton v. Maynard, 484 U.S. 836, 108 S.Ct. 116, 98 L.Ed.2d 74 (1987). A juror’s bias need not be proved with ‘unmistakable clarity’ because ‘juror bias cannot be reduced to question and answer sessions which obtain results in the manner of a catechism.’ Id.
“ ‘ “A trial judge’s finding on whether or not a particular juror is biased ‘is based upon determination of demeanor and credibility that are peculiarly within a trial judge’s province.’ Witt, 469 U.S. at 428, 105 S.Ct. at 854. That finding must be accorded proper deference on appeal. Id. ‘A trial court’s rulings on challenges for cause based on bias [are] entitled to great weight and will not be disturbed on appeal unless clearly shown to be an abuse of discretion.’ Nobis v. State, 401 So.2d 191, 198 (Ala.Cr.App.), cert. denied, Ex parte Nobis, 401 So.2d 204 (Ala.1981).”
“ ‘Martin v. State, 548 So.2d 488, 490-91 (Ala.Cr.App.1988), affirmed, 548 So.2d 496 (Ala.1989), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989). “[A] blanket declaration of support of or opposition to the death penalty is not necessary for a trial judge[ ] to disqualify a juror.” Ex parte Whisenhant, 555 So.2d 235, 241 (Ala.1989), cert. denied, 496 U.S. 943, 110 S.Ct. 3230, 110 L.Ed.2d 676 (1990).’ ”
With these principles in mind, we will address each of Duke’s claims in turn.
A.
Duke argues that the circuit court erred by denying his challenge for cause of juror R.,[5] because, he says, her questionnaire expressed a preconceived opinion of Duke’s guilt, based on what she had heard about the case and based on the Samra’s trial and conviction.
We have reviewed the voir dire conducted by the circuit court, paying particular attention to those jurors against whom challenges for cause were lodged, including juror R. While it is true that R.’s preliminary juror questionnaire expressed a preconceived opinion regarding Duke’s guilt, the questionnaire was completed before she was given the juror’s oath. After being given that oath, R. did not respond affirmatively when the venire was asked whether any juror had a fixed opinion as to Duke’s guilt or innocence, or of any knowledge of the facts that would influence her verdict. R. was also questioned at length by the circuit court, the prosecutor, and defense counsel concerning whether she could lay aside any preconceived opinions she had formed regarding Duke’s guilt. *23 R. repeatedly stated that if she was chosen to serve as a juror, she could render a verdict based solely on the law and evidence as presented at trial.
Given these circumstances, we do not believe that the circuit court erred in denying Duke’s challenge for cause as to this juror. Contrary to Duke’s claim, the record does not indicate that this juror had an absolute bias or fixed opinion. As we have stated: “ ‘[E]ven though a prospective juror admits to potential bias, if further voir dire examination reveals that the juror in question can and will base his decision on the evidence alone, then a trial judge’s refusal to grant a motion to strike for cause is not error.’ ” George v. State, 717 So.2d 827, 834 (Ala.Crim.App.), rev’d on other grounds, 717 So.2d 844 (Ala.1996) (quoting Perryman v. State, 558 So.2d 972, 977 (Ala.Crim.App.1989)). Nor does the fact that R. knew that codefendant Samra had been convicted and sentenced to death render the court’s ruling erroneous, given the juror’s assertion that she could render a verdict based solely on the law and the evidence presented at trial. See Bush v. State, 695 So.2d 70, 107 (Ala.Crim.App. 1995), aff'd, 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997). Accordingly, no error resulted from the court’s denial of Duke’s challenge for cause of juror R.
B.
Duke next argues that the circuit court erred in denying his challenges for cause as to five potential jurors who, he argues, expressed an opinion that they would give greater weight to the testimony of a law-enforcement officer than to the testimony of other witnesses. He cites as authority for his contention this Court’s decisions in Tuggle v. State, 709 So.2d 1347 (Ala.Crim.App.1997), and Uptain v. State, 534 So.2d 686 (Ala.Crim.App.1988).
Alabama law has long held that the mere fact that a prospective juror expresses an opinion that law-enforcement officials would be more likely to tell the truth when compared to other witnesses does not constitute a sufficient reason for granting a challenge for cause, so long as the juror can set aside his opinion and decide the case based solely on the law and the evidence presented at trial. See, e.g., Ex parte Myers, 699 So.2d 1285, 1290 (Ala.1997); Knotts v. State, 686 So.2d 431, 477 (Ala.Crim.App.), opinion after remand, 686 So.2d 484 (Ala.Crim.App.1995), aff'd, 686 So.2d 486 (Ala.1996), cert. denied, 520 U.S. 1199, 117 S.Ct. 1559, 137 L.Ed.2d 706 (1997); Grimsley v. State, 678 So.2d 1197, 1210 (Ala.Crim.App.1996); Stephens v. State, 675 So.2d 73, 76 (Ala.Crim.App. 1995); McCray v. State, 629 So.2d 729, 733 (Ala.Crim.App.1993); Perryman v. State, 558 So.2d 972, 977 (Ala.Crim.App.1989). It is only where the potential juror would “ ‘unquestioningly credit the testimony of law enforcement officers over that of defense witnesses,’ ” that would render a prospective juror incompetent to serve. Uptain v. State, 534 So.2d at 687, abrogated on other grounds, Bethea v. Spring-hill Memorial Hospital, 833 So.2d 1, 6-7 (Ala.2002) (quoting State v. Davenport, 445 So.2d 1190, 1193-94 (La.1984)).
We have examined that portion of voir dire where jurors Sc., Sr., Pa., Mo., and Ph. were questioned concerning whether they believed law-enforcement officials were more credible than other witnesses. Unlike the potential jurors in Tuggle and Uptain, none of the jurors in this case indicated that they would “ ‘unquestionably credit the testimony of law enforcement officers over that of defense witnesses,’ ” thus rendering them incompetent to serve. Although each of these jurors initially expressed opinions that they would tend to give the officials’ testi *24 mony more weight, further questioning revealed that while the jurors believed that the officers’ special training gave them more experience than the average layperson in certain matters, each juror also replied that he or she could weigh any officers’ testimony just as he or she would weigh any other witness’s testimony, so as to be a fair and impartial juror to both sides.[6] Therefore, the circuit court did not abuse its discretion in denying Duke’s challenges for cause as to these five jurors.
C.
Duke next argues that the circuit court erred in denying his challenges for cause of three potential jurors based on their knowledge of the case obtained from pretrial publicity regarding the case. Our review of the record reveals that during voir dire examination, Duke challenged only one of these potential jurors for cause; therefore, we will review his argument as to the remaining two jurors under the plain-error standard of review.' Rule 45A, Ala.R.App.P.
“[A] defendant is not entitled to jurors who are totally ignorant of the facts and issues involved in the case or who have never entertained a preconceived notion as to the defendant’s guilt or innocence.” Neal v. State, 731 So.2d 609, 613 (Ala. Crim.App.1997), aff'd, 731 So.2d 621 (Ala.), cert. denied, 527 U.S. 1027, 119 S.Ct. 2377, 144 L.Ed.2d 780 (1999) (citing Ex parte Grayson, 479 So.2d 76, 80 (Ala.1985)). See also Perkins v. State, 808 So.2d 1041, 1075 (Ala.Crim.App.1999), aff'd, 808 So.2d 1143 (Ala.2001). However, a prospective juror should not be excused for cause so long as that juror indicates that he or she can set aside any preconceived opinion concerning the guilt of the accused and render a fair and impartial verdict based solely on the law and the evidence presented at trial. See Ex parte Davis, 718 So.2d at 1171, and Minor v. State, 780 So.2d at 746-48.
Our review of the voir dire reveals that none of the three prospective jurors who indicated that they had gained knowledge of the case based on pretrial publicity— jurors Ca., A., and F. — appeared to have such a fixed opinion as to Duke’s guilt that they would not be able to render a fair and impartial verdict based on the law and the evidence presented at trial. Indeed, each of the three jurors affirmatively indicated as much during voir dire. Given these circumstances, the circuit court did not abuse its discretion in denying Duke’s challenge for cause as to juror Ca., nor did the court commit plain error in failing to remove for cause jurors A. and F.
D.
Duke next argues that the trial court erred in its decision regarding two challenges for cause based upon the prospective jurors’ views on the death penalty. Specifically, Duke argues that the court erred in denying his challenges for cause as to two prospective jurors who stated that they would automatically favor imposing the death penalty, should Duke be convicted of capital murder. Duke also argues that the court erred in granting the State’s challenges for cause as to a number of jurors who indicated that they were opposed to the imposition of the death penalty.
As we have previously stated,
“ ‘ “The proper standard for determining whether a prospective juror may be excluded for cause because of his or her *25 views on capital punishment is ‘whether the juror’s views would “prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.” ’ Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985).” ’ ”
Dallas v. State, 711 So.2d at 1107 (quoting Taylor v. State, 666 So.2d at 47).
1.
Duke contends that the trial court erred in denying his challenges for cause as to jurors Me. and J. because, he says, Me. expressed a fixed opinion regarding the imposition of the death penalty upon a conviction. In Price v. State, 725 So.2d at 1024, this Court stated:
“[A] preference [in favor of the death penalty], where the potential juror indicates that he or she could nonetheless consider life imprisonment without parole is not improper and it does not indicate that the juror is biased.
“ ‘[A] veniremember’s personal feelings as to the law are immaterial unless those feelings are so unyielding as to preclude the veniremember from following the law as given in the court’s instructions. “A venire-member who believes that the death penalty should automatically be imposed in every capital case should be excused.” Martin v. State, 548 So.2d 488, 491 (Ala.Cr.App.1988), aff'd, 548 So.2d 496 (Ala.), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989). However, veniremembers who favor the death penalty should not be excused for cause where they indicate they can follow the court’s instructions. Id.’
“Smith v. State, 698 So.2d 189 (Ala.Crim.App.1996), aff'd, 698 So.2d 219 (Ala.1997), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997).”
Accord Pressley v. State, 770 So.2d 115, 126 (Ala.Crim.App.1999), aff'd, 770 So.2d 143 (Ala.), cert. denied, 531 U.S. 931, 121 S.Ct. 313, 148 L.Ed.2d 251 (2000).
Here, juror Me., while indicating that she was strongly in favor of imposing the death penalty, affirmatively indicated that she could, nevertheless, base her decision whether to impose it on the law and the evidence presented at trial. Juror J. also indicated that she could base her decision upon the law and the facts of the case. While her answers were not as unequivocal as juror Me.’s, the court concluded that her opinion was not so fixed as to require that she be removed for cause. Given these circumstances, we find no abuse of discretion in the circuit court’s denial of Duke’s challenges for cause as to these jurors.
2.
Duke also contends that the circuit court erred in granting a number of the State’s challenges for cause as to jurors who indicated opposition to the death penalty.
In Pressley v. State, 770 So.2d at 127, this Court noted the following:
“In Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the United States Supreme Court held that the proper standard for determining whether a veniremember should be excluded for cause because of opposition to the death penalty is whether the venire-member’s views would ‘ “prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.” ’ The Supreme Court has expressly stated that juror bias does not have to be proven with ‘unmistakable clarity.’ Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).”
*26 See also Watkins v. State, 509 So.2d 1071, 1073 (Ala.Crim.App.1986), aff'd, 509 So.2d 1074 (Ala.), cert. denied, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987).
After reviewing the voir dire examination, we conclude that the circuit codrt did not err in granting the challenges for cause as to jurors Cr., Sm., and G. Each of these jurors indicated their strong opposition- to the death penalty. Indeed, juror Cr. stated that he could conceive a situation where he might find the defendant not guilty of capital murder so as to avoid reaching a decision on imposing the death penalty. Likewise, Juror Sm., while wavering somewhat in her responses, clearly indicated an aversion to the death penalty. She stated that she could not envision a situation deserving of the death penalty, and indicated that she would, in all likelihood, automatically vote for life imprisonment without the possibility of parole. Juror G. also indicated that there was no set of circumstances under which she would vote to impose the death penalty over life imprisonment. Given these circumstances, the court did not abuse its discretion in granting the State’s challenges for cause as to these jurors.
E.
Duke next contends that the trial court erred by failing to remove for cause a juror who was told that the jury’s decision regarding the proper sentence to be imposed was merely an advisory verdict. Specifically, he argues that his challenge for cause as to juror K. should have been granted because his “sense of responsibility had been denigrated by a description of the sentencing verdict as a mere recommendation.”
The fact that a jury’s verdict with regard to the sentence in a capital-murder case is advisory is clearly set out in both statutory law, see § 13A-5^16, AIa.Code 1975, and caselaw. The Supreme Court addressed this principle in Ex parte Taylor, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996), where the defendant argued that the statements of the prosecutor and the circuit judge indicating that the jury’s verdict was “an advisory verdict” or “a recommended sentence” misled the jury as to the importance of its role in sentencing, in violation of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). The Supreme Court rejected Taylor’s claim and held that the comments of the prosecutor and the instructions of the circuit court accurately informed the jury as to the extent of its sentencing authority, namely, that a sentence verdict is advisory and a recommendation to the court, which would make the final decision as to the defendant’s sentence, and were not constitutionally impermissible:
“It is well established that ‘the comments of the prosecutor and the instructions of the trial court accurately informing the jury of the extent of its sentencing authority and that its sentence verdict was “advisory” and a “recommendation” and that the trial court would make the final decision as to sentence does not violate Caldwell.’ Martin v. State, 548 So.2d 488, 494 (Ala.Crim.App.[1988]), affirmed, 548 So.2d 496 (Ala.[1989]), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989). See White v. State, 587 So.2d 1218 (Ala.Crim.App.1990), affirmed, 587 So.2d 1236 (Ala.1991), cert. denied, 502 U.S. 1076, 112 S.Ct. 979, 117 L.Ed.2d 142 (1992); Kuenzel v. State, 577 So.2d 474 (Ala.Crim.App.1990), affirmed, 577 So.2d 531 (Ala.1991), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991). In sum, we find no error, plain or otherwise, in the comments of the prosecutor, or in those of the trial *27 judge, regarding the jury’s role in sentencing in a capital murder trial.”
Ex parte Taylor, 666 So.2d at 88.
Juror K. was accurately informed of the jury’s role with regard to sentencing in a capital-murder case. Accordingly, the court did not abuse its discretion by denying Duke’s challenge for cause as to this juror.
F.
Duke last contends that the circuit court erred in not excusing a juror for cause because she stated that she could not render a fair and impartial verdict in a case involving the murder of children. However, our examination of the voir dire examination reveals that Duke’s challenge for cause as to juror H. was based on her statement that she did not want to be selected for jury service. Because the argument presented to this Court differs from the one presented below, we will review this claim pursuant to the plain-error standard. Rule 45A, Ala.R.App.P.
We have reviewed that portion of the voir dire examination relating to juror H.’s examination. Contrary to Duke’s contention, while H. expressed some concern that hearing the gory details of this case might be upsetting to her, she affirmatively stated that she could be a fair and impartial juror. At no time did H. indicate a bias toward Duke, thus factually distinguishing this case from England v. State, 601 So.2d 1108 (Ala.Crim.App.1992), and Hunter v. State, 585 So.2d 220 (Ala.Crim.App.1991), the cases cited by Duke in support of this claim.
Because none of the circuit court’s rulings on either the defense’s or the prosecution’s challenges for cause constituted error, plain or otherwise, Duke is not entitled to a new trial based on this claim.
IX.
Duke argues that the State was guilty of two instances of prosecutorial misconduct during closing argument of the guilt phase of his trial. Specifically, he contends that the prosecutor improperly commented on his failure to testify, and further, that the prosecutor improperly vouched for the credibility of one of the State’s witnesses.
In reviewing claims of prosecu-torial misconduct arising out of improper argument, this Court has followed the following principles:
“A reviewing court must evaluate allegedly improper comments made by the prosecutor in the context of the entire proceeding in which the comments were made. Duren v. State, 590 So.2d 360 (Ala.Cr.App.1990), aff'd, 590 So.2d 369 (Ala.1991), cert. denied, 503 U.S. 974, 112 S.Ct. 1594, 118 L.Ed.2d 310 (1992).
‘ “In judging a prosecutor’s closing argument, the standard is whether the argument so infected the trial with unfairness as to make the resulting conviction a denial of due process.” ’ Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)).
“ ‘In reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial and not to view the allegedly improper acts in the abstract. Whitlow v. State, 509 So.2d 252, 256 (Ala.Cr.App.1987); Wysinger v. State, 448 So.2d 435, 438 (Ala.Cr.App.1983); Carpenter v. State, 404 So.2d 89, 97 (Ala.Cr.App.1980), cert. denied, 404 So.2d 100 (Ala.1981). Moreover, this Court has also held that statements of counsel in argument to the jury must be viewed as *28 delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict. Orr v. State, 462 So.2d 1013, 1016 (Ala.Cr.App.1984); Sanders v. State, 426 So.2d 497, 509 (Ala.Cr.App.1982).’
“Bankhead v. State, 585 So.2d 97, 106 (Ala.Cr.App.1989), aff'd in relevant part, remanded on other grounds, 585 So.2d 112, 127 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Cr.App.1992).”
Lockhart v. State, 715 So.2d 895, 902-03 (Ala.Crim.App.1997) (quoted with approval in McWhorter v. State, 781 So.2d 257, 317-18 (Ala.Crim.App.1999), aff'd, 781 So.2d 330 (Ala.2000), cert. denied, 532 U.S. 976, 121 S.Ct. 1612, 149 L.Ed.2d 476 (2001)).
During the prosecutor’s lengthy closing argument, he addressed the evidence that established Duke’s plan to murder his family and to disguise it as a burglary. As part of this part of the argument, the prosecutor made the following comment that is the subject of Duke’s claims of improper argument:
“Samra told you all of this. They want you to believe that he is a liar. They did their best to call him a liar when he testified. I wrote down what he said, ‘The truth needed to come out. Nobody else is going to tell it. I’m telling you the truth.’ He told the truth, ladies and gentleman, and here is how we know it, there’s a witness that you heard from but he didn’t come in here and talk to you from this witness stand. After he shot, stabbed, and cut the throat of Randy Duke, he took Randy Duke’s blood with him throughout that house.”
Defense counsel objected to this comment and moved for a mistrial. The circuit court denied the motion for a mistrial, and the prosecutor continued his closing argument.
A.
Duke first contends that the above-referenced comment constituted an improper comment on his decision not to testify.
In evaluating whether a prosecutor’s comment constitutes a comment on the defendant’s failure to testify, this Court has set forth the following guidelines:
“In Windsor v. State, 683 So.2d 1021, 1023-24 (Ala.1994), the Alabama Supreme Court addressed the standard for reviewing whether a comment is a comment on an accused’s failure to testify, as follows:
“ ‘As this Court recently held in Ex parte Musgrove, 638 So.2d 1360 (Ala. 1993), “When an accused contends that a prosecutor has made improper comments during a closing argument, the statements at issue must be viewed in the context of the evidence presented in the case and the entire closing arguments] made to the jury .” 638 So.2d at 1368 ....
[[Image here]]
“ ‘Alabama, by statute, specifically protects the privilege against self-incrimination from comment by the prosecution. § 12 — 21—[220], Ala.Code 1975. A prosecutor must be extremely careful not to overstep the mark or to break with the established protocol regarding statements about that privilege. Musgrove, supra. To improperly comment on that privilege would be a clear violation of the defendant’s rights under Article I, § 6, Ala. Const. 1901, as well as the rights protected by the Fifth Amendment as that Amendment is incorporated into the *29 Fourteenth Amendment to the United States Constitution.
“ ‘In Ex parte Wilson, 571 So.2d 1251, 1261 (Ala.1990), this Court cited the standard endorsed by the United States Court of Appeals for the Eleventh Circuit:
“ ‘ “ ‘[A] statement by a prosecutor is improper if it was manifestly intended to be, or was of such a character that the jury would naturally and necessarily take it to be, a comment on the failure of the accused to testify.’ Marsden v. Moore, 847 F.2d 1536, 1547 (11th Cir.), cert. denied, 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 566 (1988); United States v. Betancourt, 734 F.2d 750, 758 (11th Cir.), cert. denied, 469 U.S. 1021, 105 S.Ct. 440, 83 L.Ed.2d 365 (1984).” ’ ”
Payne v. State, 683 So.2d 440, 448 (Ala. Crim.App.1995), aff'd, 683 So.2d 458 (Ala.1996).
We have carefully reviewed the prosecutor’s entire argument. Based on that review, it is clear to us that the jury would not have inferred the prosecutor’s comments to be a reference to Duke’s failure to testify. Nor do we believe that the prosecutor’s comment was intended to be a comment on Duke’s failure to testify or that it was “of such a character that the jury would naturally and necessarily take it to be, a comment on the failure of the accused to testify.” Marsden v. Moore, 847 F.2d 1536, 1547 (11th Cir.), cert. denied, 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 566 (1988).
We view the prosecutor’s comments regarding Samra’s testimony as argument that Samra’s testimony had been corroborated by physical evidence establishing that Randy Duke’s blood was found in various locations throughout the house, instead of a single location, thus attacking the defense’s contention that Duke was not involved in all of the killings. When viewed in context, the prosecutor did nothing more than present his reasonable impressions from the evidence and argue legitimate inferences therefrom. See Boyd v. State, 715 So.2d 825 (Ala.Crim.App.1997), aff'd, 715 So.2d 852 (Ala.), cert, denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998). Thus, this comment was not a comment on Duke’s failure to testify; it was merely an attempt by the prosecutor to establish Duke’s involvement in all of the killings at various locations in the house. Given these facts, the circuit court did not err in denying Duke’s motion for a mistrial.
B.
Duke also argues that the above-referenced comment by the prosecutor improperly vouched for the credibility of Samra, who testified against him.
In DeBruce v. State, 651 So.2d 599, 610-11 (Ala.Crim.App.1993), aff'd, 651 So.2d 624 (Ala.1994), this Court stated:
“A distinction must be made between an argument by the prosecutor personally vouching for a witness, thereby bolstering the credibility of the witness, and an argument concerning the credibility of a witness based upon the testimony presented at trial. ‘[PJrosecutors must avoid making personal guarantees as to the credibility of the state’s witnesses.’ Ex parte Parker, 610 So.2d 1181 (Ala.1992). See Ex parte Waldrop, 459 So.2d 959, 961 (Ala.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985).
“ ‘ “Attempts to bolster a witness by vouching for his credibility are normally improper and error.” ... The test for improper vouching is whether the jury could reasonably believe that the prosecutor was indicating a per *30 sonal belief in the witness’ credibility.... This test may be satisfied in two ways. First, the prosecution may place the prestige of the government behind the witness, by making explicit personal assurances of the witness’ veracity.... Secondly, a prosecutor may implicitly vouch for the witness’ veracity by indicating that information not presented to the jury supports the testimony.’
“United States v. Sims, 719 F.2d 375, 377 (11th Cir.1983), cert. denied, 465 U.S. 1034, 104 S.Ct. 1304, 79 L.Ed.2d 703 (1984).”
Accord Wilson v. State, 777 So.2d 856, 903 (Ala.Crim.App.1999), aff'd, 777 So.2d 935 (Ala.2000), cert. denied, 531 U.S. 1097, 121 S.Ct. 826, 148 L.Ed.2d 709 (2001); Price v. State, 725 So.2d 1003, 1030 (Ala.Crim.App.1997), aff'd, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999).
We have noted on many occasions that a witness’s credibility is a legitimate subject of criticism and discussion. See, e.g., Wilson v. State, 777 So.2d at 903; Price v. State, 725 So.2d at 1030; DeBruce v. State, 651 So.2d at 611; Flint v. State, 370 So.2d 332, 335 (Ala.Crim.App.1979). Here, the prosecutor did not give any personal assurance of Samra’s veracity and did not imply that he had information that had not been presented to the jury that supported Samra’s testimony. Moreover, the prosecutor’s remarks were grounded on testimony given by the witness. Given that the defense strenuously attacked the credibility of Samra’s testimony, we conclude that there was no impropriety in the prosecutor’s comments on an inference from the evidence that Samra’s statements were credible.
X.
Duke argues that the trial court made a number of errors in its jury instructions during the guilt phase of his trial. Specifically, he argues that the court erred in refusing to give several of his requested jury instructions. He also challenges the correctness of the trial court’s instruction on the lesser-included offense of intentional murder.
When reviewing a trial court’s jury instructions, this Court keeps in mind the following principles:
“A trial court has broad discretion when formulating its jury instructions. See Williams v. State, 611 So.2d 1119, 1123 (Ala.Cr.App.1992). When reviewing a trial court’s instructions, ‘ “the court’s charge must be taken as a whole, and the portions challenged are not to be isolated therefrom or taken out of context, but rather considered together.” ’ Self v. State, 620 So.2d 110, 113 (Ala.Cr.App.1992) .(quoting Porter v. State, 520 So.2d 235, 237 (Ala.Cr.App.1987)); see also Beard v. State, 612 So.2d 1335 (Ala.Cr.App.1992); Alexander v. State, 601 So.2d 1130 (Ala.Cr.App.1992).”
Williams v. State, 795 So.2d 753, 780 (Ala.Crim.App.1999), aff'd, 795 So.2d 785 (Ala.2001). “The absence of an objection in a case involving the death penalty does not preclude review of the issue; however, the defendant’s failure to object does weigh against his claim of prejudice.” Ex parte Boyd, 715 So.2d 852, 855 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998).
A.
Duke argues that the circuit court erred when it refused to give his requested charge number 15, which contained a definition of the terms “one scheme” and “course of conduct.”
*31 Duke argues that the court’s oral charge contained these terms, which were not defined for the jury. Because these terms are vague, he argues, the trial court should have given his requested jury charge defining the terms so as to provide guidance for the jury.
“When a term is included in a statute relevant to a case, and that term is not defined by statute, whether it is necessary for the trial court to define the term for the jury hinges on the facts of the case.” Ivery v. State, 686 So.2d 495, 501-02 (Ala.Crim.App.), aff'd on return to remand, 686 So.2d 520 (Ala.Crim.App.1996).
As used in this case, the terms “one scheme” and “course of conduct” are terms that could be “understood by the average juror in their common usage.” Thornton v. State, 570 So.2d 762, 772 (Ala.Crim.App.1990). Moreover, Duke has failed to show how a definition of these terms could have clarified their meaning to the jury, or that the lack of such a definition contributed to confusion among the jurors as to the meaning of these terms. Indeed, we rejected a similar claim in Wilson v. State, 777 So.2d 856, 922 (Ala.Crim.App.1999), aff'd, 777 So.2d 935 (Ala.2000), cert. denied, 531 U.S. 1097, 121 S.Ct. 826, 148 L.Ed.2d 709 (2001), regarding a trial court’s failure to define the term “many.” We concluded that the term and the statute at issue containing that particular term “ ‘define[d] the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.’ ” Wilson, 777 So.2d at 922 (quoting Kolender v. Lawson, 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983)).
Here, the court’s charge followed the applicable pattern jury instruction; that instruction contains no definition of the phrases Duke argues should have been defined. “A trial court’s following of an accepted pattern jury instruction weighs heavily against any finding of plain error.” Price v. State, 725 So.2d 1003, 1058 (Ala.Crim.App.1997), aff'd, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999). We fail to see how the court’s failure to define these phrases substantially impaired Duke’s rights. Given these circumstances, the trial court did not err in refusing to give Duke’s requested jury charge number 15.
B.
Duke also argues that the circuit court’s jury charge did not adequately address particularized intent. Therefore, he argues, the court erred in refusing to give his requested instruction number 8.
We have carefully reviewed the court’s jury charge, paying particular attention to that portion of the charge in which the court explained that for Duke to be guilty of capital murder, he must have intended to kill, or to aid and abet the killing of, each of the victims. The court stated:
“The law states that intentional murder of two or more persons is capital murder. A person commits an intentional murder of two or more persons if, pursuant to one scheme or course of conduct, he causes the death of two or more people and in performing the acts which caused the death of those people and intends to kill each of those people. ... I will also tell you that [although] more than two deceased are named in the indictment the State must only prove that at least two of the named deceased, as opposed to all the named deceased, were murdered during the defendant’s scheme or course of conduct.”
Based upon our review of the court’s oral charge, we conclude that the court *32 made it clear to the jury that in order to convict Duke of capital murder it must find that he intended to kill at least two of the victims pursuant to a single course of action. Again, we note that the court’s jury charge substantially followed the recommended pattern jury instruction. For that reason, we find that the court’s failure to give Duke’s requested jury instruction number 8, defining particularized intent, was not error. See Hyde v. State, 778 So.2d 199, 220 (Ala.Crim.App.1998), aff'd, 778 So.2d 237 (Ala.2000), cert. denied, 532 U.S. 907, 121 S.Ct. 1233, 149 L.Ed.2d 142 (2001).
C.
Duke next argues that the trial court erred when it refused to give his requested jury instruction number 14, which stated that a felony conviction cannot be had on the uncorroborated testimony of an accomplice.
This Court has long applied the harmless-error rule in capital cases where the circuit court failed to instruct the jury on the requirement that an accomplice’s testimony be corroborated. See, e.g., Hyde v. State, 778 So.2d at 221; Arthur v. State, 711 So.2d 1031, 1058-59 (Ala.Crim.App. 1996), affd, 711 So.2d 1097 (Ala.1997); Gurley v. State, 639 So.2d 557 (Ala.Crim.App.1993); Frazier v. State, 562 So.2d 543, 558 (Ala.Crim.App.), rev’d on other grounds, 562 So.2d 560 (Ala.1989).
Even though the court did not instruct the jury that Samra was an accomplice, his status as a codefendant was made abundantly clear through his testimony. Moreover, the circuit court cautioned the jury to look for and to consider possible bias on the part of a witness. Finally, although Samra testified against his codefendant, Duke was not convicted based solely upon Samra’s testimony. As previously noted, the State presented numerous witnesses and substantial physical evidence connecting Duke with the murders. This other evidence corroborated Samra’s testimony and was sufficient to support Duke’s conviction. Accordingly, any error in the court’s failure to charge the jury on the necessity of accomplice corroboration was harmless.
D.
Duke challenges the correctness on the circuit court’s instruction on the lesser-included offense of intentional murder. He argues that the instruction did not permit the jury to consider whether he was guilty of intentionally murdering two or more people, but not pursuant to a common scheme or plan. Duke argues that the jury was left with the choice of either finding him guilty of capital murder for two or more murders or finding him guilty of only one intentional murder.
Our review of the court’s oral charge does not support Duke’s claim. The court instructed the jury that if it did not find that the State had proved beyond a reasonable doubt each of the elements of capital murder, including the fact that the murders were committed pursuant to one scheme or course of conduct, then it could not find Duke guilty of capital murder. If the jury concluded that the State had failed to prove that Duke was guilty of capital murder, the court instructed the jury that it could consider whether the State had proved that Duke was guilty of the lesser-included offense of intentional murder. Duke’s contention that the jury was forced to choose between two widely disparate verdicts is not supported by the record. Accordingly, the court’s instruction was not plainly erroneous. Thus, no basis for reversal exists.
Penalty-Phase Issues XI.
Duke, who was 16 years old when he committed the capital offenses, argues *33 that imposing the death sentence on him violates the Eighth Amendment’s prohibition against cruel and unusual punishment. The Alabama Supreme Court rejected this argument in Ex parte Pressley, 770 So.2d 143 (Ala.2000). In Pressley, the Supreme Court, relying on the United States Supreme Court’s decision in Stanford v. Kentucky, 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989), held that the execution of a defendant who was 16 or 17 years old at the time he committed the capital offense did not offend the Eighth Amendment’s prohibition against cruel and unusual punishment, noting:
“Unlike the appellant in Thompson [v. Oklahoma, 487 U.S. 815 (1988) ], who was 15 years old when he committed the capital offense, Pressley was 16 years old when he committed his capital offenses. Furthermore, Alabama’s statutory scheme mandates that a person 16 years old charged with a capital offense be tried as an adult, and that scheme is similar to the statutory scheme that was in effect in Oklahoma when Thompson was decided. Because Pressley was 16 when he committed the capital offenses, we conclude that the death penalty was legally imposed upon him.”
Ex parte Pressley, 770 So.2d at 149 (footnote omitted). Accord Ex parte Burgess, 811 So.2d 617, 628-29 (Ala.2000). Based on the foregoing, no basis for reversal exists as to this issue.
XII.
Duke also argues for the first time on appeal that the imposition of the death sentence in his case violates international law, specifically the International Covenant on Civil and Political Rights, which was ratified by the United States in 1992. This identical issue was addressed by the Alabama Supreme Court in Ex parte Pressley, 770 So.2d at 148-49. After a thorough discussion of the merits of the issue, the Supreme Court rejected this claim. In light of the Supreme Court’s holding in Pressley, we see no reason to revisit this issue.
XIII.
Duke next argues that the manner of execution used by the State of Alabama violates the Eighth Amendment’s prohibition against cruel and unusual punishment.
Duke’s argument has been rejected by this Court on numerous occasions:
“There is an abundance of caselaw ... that holds that the death penalty is not per se cruel and unusual punishment. Neither is electrocution, as a means of capital punishment, cruel and unusual punishment, in violation of the Eighth Amendment. Williams v. State, 556 So.2d 737, 741 (Ala.Cr.App.1986), affd in part, rev’d in part on other grounds, 556 So.2d 744 (Ala.1987); Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); Boykin v. State, 281 Ala. 659, 207 So.2d 412 (1968), reversed on other grounds, Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969).”
Scott v. State, 728 So.2d 164, 171 (Ala.Crim.App.1997), aff'd, 728 So.2d 172 (Ala.1998), cert. denied, 528 U.S. 831, 120 S.Ct. 87, 145 L.Ed.2d 74 (1999). See also Stephens v. State, 580 So.2d 11, 26 (Ala.Crim. App.1990), aff'd, 580 So.2d 26 (Ala.), cert. denied, 502 U.S. 859, 112 S.Ct. 176, 116 L.Ed.2d 138 (1991); and Thompson v. State, 542 So.2d 1286 (Ala.Crim.App.1988), aff'd, 542 So.2d 1300 (Ala.), cert. denied, 493 U.S. 874, 110 S.Ct. 208, 107 L.Ed.2d 161 (1989).
*34 Duke offers no novel arguments in support of his contention. Accordingly, we rely on our previous holdings and reject his contention that the manner of execution used by the State of Alabama constitutes cruel and unusual punishment. We further note the passage of Act No. 2002-492, Ala. Acts 2002, which provides for lethal injection as an alternate means of execution. Act No. 2002-492 becomes effective July 1, 2002. Based on the passage of this Act, Duke’s argument is effectively moot.
XIV.
Duke next contends that the prosecutor improperly interjected his opinion that Duke was particularly deserving of the death penalty during the penalty-phase closing argument.
During the prosecutor’s final closing argument in the penalty phase of the trial, he made the following comment:
“I don’t know how you personally feel about the death penalty but it exists in the State, and if there has ever been a case that said whatever the maximum punishment is, has got to exist," whatever that punishment is, and here it is the death penalty. The district attorney has got to ask for it and I’m proud to ask for it here.”
Defense counsel objected to the prosecutor’s remark and moved for a mistrial, whereupon the prosecutor promptly withdrew the remark. The circuit court denied the motion for a mistrial motion, and, with the approval of defense counsel, gave the following cautionary instruction: “Ladies and gentlemen, of course, you are to disregard the prosecutor’s personal feelings that he might have mentioned to you in his closing argument.”
, In Part IX of this opinion, we set out the general principles governing the review of prosecutorial misconduct arising out of improper argument. Contrary to Duke’s claim that the prosecutor’s claim improperly “carried the ‘imprimatur of the government,’ ” we view the prosecutor’s remarks as an attempt to express to the jury his opinion that the seriousness of Duke’s offense justified the State’s asking for the maximum punishment allowed by law.
We likewise find no basis for reversing Duke’s conviction based on the cases cited in Duke’s brief. In Guthrie v. State, 616 So.2d 914 (Ala.Crim.App.1993), opinion after remand, 689 So.2d 935 (Ala.Crim.App.1996), aff'd, 689 So.2d 951 (Ala.1997), cert. denied, 522 U.S. 848, 118 S.Ct. 135, 139 L.Ed.2d 84 (1997), this Court held improper a remark by the prosecutor to the effect that all law-enforcement officials had agreed from the very beginning that Guthrie’s case was a death-penalty case because the remark implied that the decision to impose the death sentence had already been made. This was not the case here. Clearly, the prosecutor’s statements were an attempt to explain why the State was asking for the maximum punishment allowed by law.
Duke argues that our decision in Carroll v. State, 599 So.2d 1253, 1268-69 (Ala.Crim.App.1992), supports his contention that the prosecutor’s comments were improper and warrant reversal. However, a careful examination of Carroll contradicts this claim. Although this Court did, in fact, determine that the prosecutor’s remarks were improper, we determined that no error occurred based upon the court’s prompt instruction to the jury that the remark was not to -be considered. 599 So.2d at 1269 (citing Ex parte Brooks, 562 So.2d 604, 605 (Ala.1990)). Thus, no basis for reversal exists as to this claim.
XV.
Duke argues that the circuit court “improperly coerced the jury into re *35 turning a death sentence after the jury told the court that it was unable to find the existence of an aggravating circumstance.” Specifically, Duke contends that the court’s instruction violated the Supreme Court’s holding in Ex parte Giles, 554 So.2d 1089 (Ala.1987).
The record reflects that approximately two hours after the jury had retired to begin deliberations in the penalty phase, the jury foreperson sent a note to the court asking, “What happens [if] we cannot agree on aggravating circumstances?” (R. 2692.) The court and counsel discussed the meaning of the note, concluding that the question, as phrased, was a hypothetical one, because there was no indication that the jurors were hopelessly deadlocked and unable to reach a decision. The court and counsel discussed possible options and, because the jury had been deliberating for a relatively brief period, one of Duke’s attorneys suggested that the court send a note back to the jury foreperson requesting that the jury continue deliberations.
As a general rule, Alabama law prohibits a defendant from assuming inconsistent positions in the trial court and the appellate court; the defendant will not be permitted to allege as error an action at trial that was invited by him or that was a natural consequence of his own actions. See, e.g., Melson v. State, 775 So.2d 857, 874 (Ala.Crim.App.1999), aff'd, 775 So.2d 904 (Ala.2000). The invited-error rule is applicable equally in both capital cases and noncapital cases. Harris v. State, 682 So.2d 503, 541 (Ala.Crim.App.1992), aff'd, 632 So.2d 543 (Ala.1993), aff'd, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995). Moreover, invited error is waived, unless it rises to the level of plain error. Melson v. State, 775 So.2d at 874.
Given the circumstances of this case, we cannot say that the circuit court’s actions did not constitute error, particularly since the note requesting that the jury continue to deliberate came at the suggestion of defense counsel. The facts of this case are easily distinguishable from those in Giles, since at no time did the jury in this case indicate that it was “hopelessly deadlocked.” Moreover, the circuit court did not give an Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), charge. The circuit court’s request that the jury continue deliberations did not coerce the jury into returning a death sentence. Thus, the circuit court committed no plain error with regard to this claim. See Stallworth v. State, 868 So.2d 1128, 1170 (Ala.Crim.App.2001).

Sentencing-Order Issues

XVI.
Duke argues that the circuit court arbitrarily and capriciously determined that the facts of this case warranted a finding that the offense was especially heinous, atrocious, or cruel when compared to other capital offenses. Specifically, Duke challenges the constitutionality of this aggravating circumstance, as well as the evidence upon which the court based its finding that this aggravating circumstance was applicable to this ease.
The constitutionality of the “especially heinous, atrocious or cruel” aggravating circumstance has been addressed on numerous occasions by this Court. We have consistently upheld the constitutionality of this aggravating circumstance:
“To the extent that Ingram is claiming that the ‘especially heinous, atrocious or cruel’ statutory aggravating circumstance found in § 13A-5-49(8)[, Ala. Code 1975], is unconstitutionally vague and overbroad on its face, that contention is without merit. See Freeman v. State, 776 So.2d 160 (Ala.Crim.App.1999); Bui v. State, 551 So.2d 1094 (Ala.Crim.App.1988), aff'd, 551 So.2d 1125 *36 (Ala.1989), judgment vacated on other grounds, 499 U.S. 971, 111 S.Ct. 1613, 113 L.Ed.2d 712 (1991); Hallford v. State, 548 So.2d 526 (Ala.Crim.App.1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989).”
Ingram v. State, 779 So.2d 1225, 1277 (Ala.Crim.App.1999), aff'd, 779 So.2d 1283 (Ala.2000).
When considering whether a particular capital offense was “especially heinous, atrocious or cruel,” this Court adheres to the standard set out in Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981), namely, that the particular offense must be one of those “conscienceless or pitiless homicides which are unnecessarily torturous to the victim.”
Here, the circuit court found that the murders were especially heinous, atrocious, or cruel as compared to other capital murders. The court, in its sentence order, stated merely that:
“The capital offense was especially heinous, atrocious or cruel, compared to other capital offenses.”
The court’s order fails to comply with Ex parte Kyzer, because the trial court failed to make specific findings of fact as to why it believed that this aggravating circumstance existed. Although the circuit court made findings of fact in another part of its three-part sentencing order, those facts do not establish specific findings as to the standard set forth in Ex parte Kyzer. See, e.g., Stallworth v. State, 868 So.2d 1128, 1175 (Ala.Crim.App.2001).
This Court has approved the application of this aggravating circumstance when the testimony established that the victims were stabbed multiple times and that they had suffered before their deaths. See Price v. State, 725 So.2d at 1062; Barbour v. State, 673 So.2d 461, 471 (Ala.Crim.App. 1994), aff'd, 673 So.2d 473 (Ala.1995), cert. denied, 518 U.S. 1020, 116 S.Ct. 2556, 135 L.Ed.2d 1074 (1996); Hallford v. State, 548 So.2d 526, 546 (Ala.Crim.App.1988), aff'd, 548 So.2d 547 (Ala.1989), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989). However, when circuit courts have found this aggravating circumstance to exist, this Court has required the court to make specific findings of fact explaining why this aggravating circumstance was applicable. We quote the circuit court’s sentencing order in Barbour, where the court stated:
“ ‘The Court does find that Roberts did suffer before she was killed, because she was savagely beaten by Barbour, Mitchell and Hester into a stupefied state or into a state of unconsciousness. In any event, she was rendered helpless. What Roberts’s thoughts were during this attack, we will never know. However, common sense dictates that when attacked by three relative strangers, one must be fearful of their ultimate fate. Thus, Roberts suffered psychologically. In addition, the blows were surely painful.
“ ‘The Court finds that based on a consideration of all the circumstances from the moment the attack began until Barbour, Mitchell and Hester left Roberts’s home, the State has proved beyond a reasonable doubt that the capital offense was heinous, atrocious, or cruel. This legal conclusion is based on an amalgam of the case law on this subject. ...
“ ‘A summary of the facts is appropriate. Roberts was beaten into a helpless state. She was then raped by Hester as she lay helpless. Barbour concluded that she must die because she knew who her attackers were, and he stabbed her nine times with such force that two of the blows penetrated Roberts’ back. *37 Barbour left the murder weapon protruding from Roberts’ chest. Barbour then set afire or fires in an attempt to hide the criminal act. The fires resulted in some mutilation of Roberts’s body.’ ”
673 So.2d at 471 (emphasis in Barbour).
We do not wish to question the existence of this aggravating circumstance. Indeed, this Court found the existence of the “especially heinous, atrocious, or cruel” aggravating circumstance in our review of the conviction and sentence of Duke’s co-defendant, Brandon Samra. See Samra v. State, 771 So.2d 1108, 1121 (Ala.Crim.App.1999), aff'd, 771 So.2d 1122 (Ala.), cert. denied, 531 U.S. 933, 121 S.Ct. 317, 148 L.Ed.2d 255 (2000). However, given that the circuit court found only one aggravating circumstance to exist — that this offense was “especially heinous, atrocious, or cruel, compared to other capital offenses” — we find it necessary to remand this case to the circuit court for specific findings of fact as to why the murders were “especially heinous, atrocious or cruel” when compared with other capital murders.
XVII.
Duke also argues that the findings in the circuit court’s sentencing order were insufficient. He further argues that the court “engaged in an improper weighing process” in sentencing him to death.
Our review of the sentencing order reveals that the circuit court found the existence of one aggravating circumstance, as enumerated in § 13A-5-49, Ala.Code 1975, and two statutory mitigating circumstances, as enumerated in § 13A-5-51, Ala.Code 1975. The court’s order also stated that it heard testimony regarding the alleged abuse of Duke by his father, Duke’s childhood and family background, and Duke’s personality. The court’s order is unclear as to whether this evidence was sufficient to constitute a nonstatutory mitigating circumstance, as defined in § 13A-5-52, Ala.Code 1975. Although the sentencing order initially stated that this evidence was not sufficient to constitute a nonstatutory mitigating circumstance, the court subsequently stated that it found Duke’s “background and family history has certain mitigating aspects which the Court considered in mitigation.” Because it appears that the circuit court did, in fact, find testimony regarding Duke’s background and family history to be mitigating, the order fails to state what weight the court gave this evidence.
Because this case must be remanded so that the circuit court can correct its sentencing order to comply with § 13A-5-47(d), Ala.Code 1975, we also direct the circuit court to set out what aspects of Duke’s background and family history constituted mitigating evidence, and what weight it gave this evidence.
By remanding this case for the trial court to correct its sentencing order we do not mean to imply that the facts of this case do not support the sentence of death imposed by the circuit court. We merely remand this case so that the circuit court can comply with Alabama law, in order that this Court may better review the appropriateness of Duke’s death sentence, as we are required to do pursuant to § 13A-5-53, Ala.Code 1975.
For the reasons stated above, Duke’s conviction for the capital murders of Randy Gerald Duke, Dedra Mims Hunt, Cheli-sa Nicole Hunt, and Chelsea Marie Hunt are hereby affirmed. This case is remanded for the reasons stated in Parts XVI and XVII of this opinion so that the trial court can correct its sentencing order as instructed in Parts XVI and XVII. The circuit court is further directed to reweigh the aggravating circumstance and the miti *38 gating circumstances. The circuit court shall take all necessary action to see that the circuit clerk makes due return to this Court at the earliest possible time and within 56 days of the release of this opinion.
AFFIRMED AS TO CONVICTION; REMANDED WITH DIRECTIONS AS TO SENTENCING.
McMILLAN, P.J., and COBB and BASCHAB, JJ., concur. SHAW, J., concurs specially, with opinion.

. Although Judge Wise was not a member of this Court when this case was orally argued, she has reviewed the audiotapes and videotapes of the oral argument.

. The trial court's sentencing order was actually composed of several different orders, each encompassing a separate aspect of the case, e.g., findings of fact, the weighing of the aggravating circumstances and the mitigating circumstances. (C. 548-57.)

. On June 18, 1999, this Court affirmed Sam-ra's conviction and sentence. Samra v. State, 771 So.2d 1108 (Ala.Crim.App.1999), aff'd, 771 So.2d 1122 (Ala.), cert. denied, 531 U.S. 933, 121 S.Ct. 317, 148 L.Ed.2d 255 (2000).

. We note that this was a slightly lower percentage than the 83.9% who had heard about the case involving Duke's codefendant, Michael Brandon Samra. See Samra, 771 So.2d at 1115.

. In an effort to protect the anonymity of the challenged jurors, we have used their initials.

. Given that Duke did not have to use one of his peremptory challenges to strike jurors M. and P., we conclude that no prejudice resulted to him from the court's denial of his challenges for cause. See Gaddy v. State, 698 So.2d 1100, 1120 (Ala.Crim.App.1995), aff'd, 698 So.2d 1150 (Ala.), cert. denied, 522 U.S. 1032, 118 S.Ct. 634, 139 L.Ed.2d 613 (1997).